UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| KETIA LAFORTUNE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| BRONXWORKS, INC., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| | ) | |

## COMPLAINT AND JURY DEMAND

## PARTIES

1. The Plaintiff, Ketia LaFortune ("Ms. LaFortune" or the "Plaintiff"), is an adult female resident of the state of New York, residing in Bronx, New York 10473, witin New York City.

2. Defendant BronxWorks, Inc. (the "Company" or the "Defendant") is a domestic not-for-profit corporation doing business in the State of New York. The Company has an office located at 60 East Tremont Avenue, Bronx, New York, New York 10453-5842.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff has brought claims pursuant to the Americans with Disabilities Act and Title VII. This Court may exercise supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

4. Venue is appropriate in the Southern District of New York as the acts or omissions giving rise to the claims in this Complaint occurred in the Southern District of New York.

5.      This Court has personal jurisdiction over the Company because the Company is a resident of the State of New York, including because it is incorporated in New York and has its principal place of business in New York.  This Court also has personal jurisdiction over the Company because the Company has engaged in and transacted business in the State of New York, including by managing and/or operating a business in New York and/or by employing Ms. LaFortune in New York, and Ms. LaFortune's causes of action stem from the Company's business transactions within the State of New York. Indeed, Ms. LaFortune was employed by the Company in the State of New York, was managed and supervised by the Company in the State of New York, was discriminated against and harassed by the Company in the State of New York, and was terminated by the Company in the State of New York. In addition, the Company is registered with the New York Department of State's Division of Corporations.

### STATEMENT OF FACTS

6.      On or around March 18, 2019, Ms. LaFortune was hired by the Company to work as a case manager in the Bronx, New York.

7.      Ms. LaFortune is an African American woman with black skin color.

8.      At all relevant times, the Company employed 15 or more employees for 20 or more calendar weeks during the preceding 12 months.

9.      As such, at all relevant times, the Company was a covered employer under the New York State Human Rights Law, the New York City Human Rights Law ("NYCCHR"), Title VII of the Civil Rights Act ("Title VII"), and the Americans with Disabilities Act ("ADA").

10.      At all relevant times, Ms. LaFortune was a qualified employee, and her job performance was satisfactory.

11.     After Ms. LaFortune began working for the Company, she noticed she was the only African American person with black skin color working on her team. Indeed, Ms. LaFortune noticed many of her coworkers were Hispanic and had lighter skin color than herself (Ms. LaFortune).

12.     Shortly after she began working for the Company, Ms. LaFortune noticed she was being excluded from conversations amongst her Hispanic coworkers with lighter skin color, seemingly due to her race and/or darker skin color.

13.     On or around March 18, 2020, the Company moved to remote working due to the COVID-19 pandemic.

14.     In or around mid-October 2020, Ms. LaFortune began experiencing frequent headaches and heart palpitations, which were ultimately diagnosed as caused by generalized anxiety disorder.

15.     Ms. LaFortune's generalized anxiety disorder is (and at all times was) an impairment that substantially limited one or more of her major life activities, including, but not limited to, caring for herself, socializing with others, and concentrating. Further, Ms. LaFortune's generalized anxiety disorder substantially limited the operation of one or more of her major bodily functions, including, but not limited to, her neurological functions.

16.     Accordingly, Ms. LaFortune's generalized anxiety disorder was a disability under the ADA and New York state and city law.  Further, at all relevant times, Ms. LaFortune was a qualified individual with a disability under the federal, state, and city law.

17.     As such, Ms. LaFortune contacted the Company's Director of Human Resources, Anca Dragomirescu ("Dragomirescu"), and disclosed her generalized anxiety disorder disability.

18.     Dragomirescu is a non-disabled, non-African American woman with light skin color.

19.     Specifically, Ms. LaFortune disclosed to Dragomirescu that she (Ms. LaFortune) was dealing with a flare up of disability-related symptoms associated with her generalized anxiety disorder, including, but not limited to, heart palpitations and strong feelings of anxiety.

20.     Following Ms. LaFortune's disclosure of her disability, a meeting was scheduled between Ms. LaFortune; Dragomirescu; Anya Isham ("Isham"), an HR associate; Arturo Lopez ("Lopez"), a staff attorney; and Caroline Morales ("Morales"), a staff attorney.

21.     Isham is a non-disabled woman.

22.     Lopez is a non-disabled, non-African American man with light skin color.

23.     Morales is a non-disabled, non-African American woman with light skin color.

24.     In or around late-October 2020, Ms. LaFortune attended the meeting with Dragomirescu, Isham, Morales, and Lopez as scheduled.

25.     At this meeting, Ms. LaFortune again disclosed her generalized anxiety disorder, and further explained she was experiencing a flare up of disability-related symptoms, including, but not limited to, heart palpitations and difficulty sleeping due to her anxiety.

26.     Also during this meeting, Ms. LaFortune raised protected concerns regarding the disparate treatment she was facing, including that she was being ignored and ostracized as an African American with black skin color while working for the Company.

27.     More specifically, Ms. LaFortune noted she was the only African American individual with black skin color on her team, and her Hispanic coworkers with lighter skin color excluded Ms. LaFortune from their conversations.

28.    Morales and Lopez dismissed Ms. LaFortune's protected concerns and laughed at them.

29.    Despite the serious nature of Ms. LaFortune's protected concerns, the Company failed to take any meaningful steps to address her protected concerns.

30.    On or around October 25, 2020, Ms. LaFortune contacted Benefits and Leave Specialist, Nancy Fullerton ("Fullerton") and disclosed her generalized anxiety disorder and inquired into the use of a disability-related accommodation of protected medical leave and asked what protected medical leave options were available to her.  Ms. LaFortune made clear that she wanted to use leave time in the future if allowed.

31.    Fullerton is a non-disabled, non-African American woman with light skin color.

32.    Fullerton suggested that Ms. LaFortune might be eligible for FMLA-protected medical leave, and it was clear that this conversation (as well as earlier disclosures) put the Company on notice of Ms. LaFortune's intent to request and utilize a disability-related accommodation of protected leave in the near future.

33.    Throughout November 2020, Ms. LaFortune discussed her disability and disability-related flare up of symptoms with her doctor. Based on the nature of Ms. LaFortune's flare up, her doctor recommended Ms. LaFortune utilize a disability-related accommodation of a protected medical leave due to her ongoing disability-related condition.

34.    On November 30, 2020, Ms. LaFortune emailed Fullerton disclosing that "I . . . got news from the various specialists I've been going to and my heart struggles are not getting better."  Ms. LaFortune further asked Fullerton to send any necessary paperwork for a disability-related leave.

35.    In addition, Ms. LaFortune explicitly noted that she spoke with another medical specialist who told her (Ms. LaFortune) she needed breaks in her work as "[t]he pain is increasing without pause/breaks."

36.    As such, as of November 30, 2020, Ms. LaFortune had explicitly requested disability-related accommodations in writing (which reiterated previous verbal requests).

37.    On or around December 8, 2020, Fullerton provided Ms. LaFortune with the necessary paperwork for her disability-related leave.

38.    Following this, Ms. LaFortune worked with her doctor to complete the necessary paperwork.

39.    By mid-December 2020, based on the severity of Ms. LaFortune's ongoing disability-related symptoms, Ms. LaFortune's doctor recommended she utilize a disability-related accommodation of continuous medical leave until early January 2021.

40.    Ms. LaFortune's doctor completed the required FMLA medical paperwork justifying this continuous medical leave, beginning on or around December 23, 2020 and with a return-to-work date of on or around January 11, 2021.

41.    On December 21, 2020, Ms. LaFortune provided the Company her completed FMLA paperwork, which certified Ms. LaFortune's request for a disability-related accommodation of continuous FMLA protected medical leave.

42.    On or around December 22, 2020, Ms. LaFortune received approval from the Company for her disability-related accommodation of protected continuous medical leave from on or around December 23, 2020, until a return-to-work date of on or around January 11, 2021.

43.    During Ms. LaFortune's disability-related medical leave, Ms. LaFortune reflected further on how she had been discriminated against due to her race and skin color while working for the Company.

44.    In light of this, Ms. LaFortune sent a letter to Executive Director Eileen Torres ("Torres") on January 7, 2021, wherein Ms. LaFortune raised further protected concerns about how the Company had been discriminating against her.

45.    Torres is a non-disabled, non-African American woman with light skin color.

46.    For example, Ms. LaFortune noted that, upon information and belief, she (Ms. LaFortune) was receiving lower pay than similarly situated colleagues in her position because she was "the lone African-American woman in [her] department."

47.    In addition, Ms. LaFortune went on to raise protected concerns that she was being denied training and micromanaged on account of her (Ms. LaFortune's) race and skin color.

48.    Indeed, Ms. LaFortune raised protected concerns that "no training and support was given to [her]" and her "repeated request[s] for meetings to discuss performance and task[s] were denied," and the Company communicated to Ms. LaFortune in a way designed to "break [her] moral[e], [and to] cause emotional stress."

49.    Furthermore, Ms. LaFortune raised protected concerns that the discrimination against her was because she was an "African-American, in an organization that serves and hires predominantly Hispanic/Latin individuals."

50.    Ms. LaFortune did not receive a response to her January 7, 2021, protected discrimination concerns.

51.     On or around January 11, 2021, Ms. LaFortune returned to work as anticipated from her approved disability-related accommodation of FMLA-protected, disability-related medical leave.

52.     Upon returning to work from her approved disability-related medical leave, Ms. LaFortune noticed she was being further ignored by her non-African American coworkers and supervisors with lighter skin color.

53.     For example, although Ms. LaFortune frequently spoke with Morales throughout the course of her work, Morales refused to speak with Ms. LaFortune for several days after Ms. LaFortune's return to work from her disability-related protected medical leave.

54.     In or around February 2021, Dragomirescu informed Ms. LaFortune that she (Ms. LaFortune) was being transferred to the Company's elder abuse department, and her new supervisor would be Maria Rivera ("Rivera").

55.     Rivera is a non-disabled, non-African American woman with light skin color.

56.     During this conversation, Ms. LaFortune took this opportunity to ask Dragomirescu why the Company never responded to her (Ms. LaFortune's) January 7, 2021 letter raising protected discrimination concerns.

57.     In addition to requesting an explanation as to why the Company never responded to her (Ms. LaFortune's) protected concerns, Ms. LaFortune raised further protected concerns, including explaining she was still being discriminated against due to her race and skin color, including because she continued to be ostracized and ignored by her coworkers and the Company was ignoring her protected concerns.

58. Dragomirescu admitted the Company received the previous letter expressing Ms. LaFortune's protected concerns, but dismissively claimed the Company had not found the time to look into them.

59. As such, it was clear the Company did not take Ms. LaFortune's protected concerns seriously and made no meaningful effort to investigate or address them.

60. In or around March 2021, Ms. LaFortune received an email from Rivera telling her the Company was returning to the office from remote work.

61. Accordingly, Ms. LaFortune returned to working at the office as directed.

62. Upon information and belief, Ms. LaFortune was the only case manager ordered to return from remote work. Indeed, Ms. LaFortune was the only case manager working at the office. Thus, the Company misrepresented that it was "returning to the office" in March 2021 as a pretext to in fact target Ms. LaFortune with negative disparate treatment by requiring her to return to the office while allowing other non-disabled, non-African American case managers to continue to work remotely.

63. For example, Sandy DeJesus ("DeJesus"), a case manager, continued to work remotely throughout 2021.

64. DeJesus is a non-African American woman with light skin color.

65. Further, Wendy Acosta ("Acosta"), a case manager, also continued to work remotely throughout 2021.

66. Acosta is a non-disabled, non-African American woman with light skin color.

67. Furthermore, Amanda Nieves ("Nieves"), a program assistant (which was a position situated below case managers), was not required to be present at the worksite as often as

Ms. LaFortune was (and was allowed to work remotely more often), despite Nieves being in a subordinate role and having similar scheduled hours to those of Ms. LaFortune.

68.    Nieves is a non-disabled, non-African American woman with light skin color.

69.    As Ms. LaFortune was the only case manager required to work from the office at that time and there appeared to be no legitimate justification as to why other case managers were permitted to continue to work remotely, it was clear she (LaFortune) was being required to work at the worksite due to her race, skin color, disability, and/or because she had engaged in protected activity, including by using a protected disability-related leave and by raising protected concerns about unlawful discrimination.

70.    In light of this, in or around May 2021, Ms. LaFortune raised protected concerns to Rivera that she (Ms. LaFortune)—the only African American—was being required to come in when her non-African American, non-disabled case manager colleagues who didn't engage in protected activities were allowed to continue to work remotely.

71.    Rivera became clearly upset that Ms. LaFortune was raising protected concerns about the discrimination she was being subjected to, and she dismissively told Ms. LaFortune to stop worrying about her coworkers.

72.    In addition to Rivera being angry that Ms. LaFortune raised protected concerns, the Company failed to take any meaningful actions to address Ms. LaFortune's protected concerns and indeed retaliated against Ms. LaFortune.

73.    For example, in or around December 2021, Rivera told Ms. LaFortune that she (Ms. LaFortune) was being transferred to a new location where Ms. LaFortune would be the only employee working.

74.    It was clear the Company was continuing to isolate Ms. LaFortune due to her race, skin color, and/or because Ms. LaFortune engaged in protected activities.

75.    In or around December 2021, after learning of her relocation, Ms. LaFortune raised protected concerns to Rivera that she (Ms. LaFortune)—an African American woman with disabilities—was being treated differently and worse than non-African American, non-disabled employees, including by being required to come into the worksite alone and being transferred to a less desirable worksite.

76.    In response, Ms. Rivera asserted the Company was currently searching for applicants to fill open positions for the worksite.  Despite this, no new employees ever arrived and Ms. LaFortune was required to continue working in isolation.

77.    In or around February 2022, the Company still had not placed any employees at the worksite, and Ms. LaFortune was told to take on all the additional duties that would have been otherwise handled by other staff.  This meant that Ms. LaFortune was required to complete far more work than other case managers.

78.    For example, because Ms. LaFortune was the only employee at this location, Ms. LaFortune was required to perform clerical work, scheduling work, janitorial work, and administrative work on top of her duties as a case manager.

79.    Upon information and belief, the Company provides support staff for its non-disabled, non-African American case managers who don't engage in protected activities.

80.    However, the Company declined to provide Ms. LaFortune with such support and forced her to take on these additional duties that were not typically required of non-African American, lighter skinned and/or white, and/or non-disabled case workers.

81.     On or around June 6, 2022, Ms. LaFortune again contacted Rivera to raise further protected concerns that she was still being denied support staff and requesting a meeting.

82.     Rivera ignored Ms. LaFortune's correspondence and no meaningful actions were taken to address her protected concerns.

83.     On or around August 9, 2022, given Rivera's continued failure to take any meaningful actions to address Ms. LaFortune's protected concerns, Ms. LaFortune raised protected concerns to HR associates Ann-Chevalle Brown ("Brown") and Kaytee Jones ("Jones"), including protected concerns relating to the discriminatory discrepancies in pay, job duties, and support, which were seemingly due to Ms. LaFortune's race, skin color, disability, and because she engaged in protected activities.

84.     Brown is non-disabled with lighter skin color than Ms. LaFortune.

85.     Jones is non-disabled with lighter skin color than Ms. LaFortune.

86.     On or around August 10, 2022, Ms. LaFortune had a meeting with HR associates Afridi Hussein ("Hussein") and Yaniri Checo ("Checo"), and Vice President of Employee Relations Felicia Rickett-Samuels ("Rickett-Samuels") regarding her (Ms. LaFortune's) protected concerns.

87.     Hussein is a non-disabled, non-African American man.

88.     Checo is a non-disabled, non-African American woman with light skin color.

89.     Upon information and belief, Rickett-Samuels is non-disabled.

90.     At this meeting, Ms. LaFortune again raised protected concerns that she was being discriminated against because of her race, skin color, disability, and/or because she engaged in protected activities.  In addition, Ms. LaFortune stated how it was discriminatory for

her—the only African American—to be required to work from the office for months while Ms. LaFortune's non-African American, non-disabled coworkers were allowed to work remotely.

91.     Ms. LaFortune also raised protected concerns that she was being paid less than her non-African American, non-disabled coworkers with lighter skin color, despite doing the same amount of work.

92.     Rickett-Samuels was dismissive of Ms. LaFortune's protected concerns and accusatorily asked why Ms. LaFortune had waited so long to raise protected concerns.

93.     Shocked, Ms. LaFortune explained she had raised protected concerns with Rivera on several occasions, but on each instance, Rivera had been dismissive of her (Ms. LaFortune) and declined to respond in a meaningful, proper manner.

94.     Rickett-Samuels claimed that she would speak with Rivera and ended the meeting.

95.     On or around August 25, 2022, approximately two weeks after raising protected concerns with Company HR, Rivera abruptly alleged that Ms. LaFortune's position was being eliminated due to budget constraints.

96.     Accordingly, on or around August 25, 2022, due to this highly suspicious supposed "position elimination," Ms. LaFortune was involuntarily terminated from her position with the Company.

97.     Upon information and belief, no other Company employees were terminated on or around August 25, 2022 due to these alleged budget constraints.

98.     Upon information and belief, there were no budget cuts and the proffered reason for Ms. LaFortune's termination was pretext.

99.    Indeed, soon after Ms. LaFortune's termination, Ms. LaFortune was notified that the Company was hiring case managers in her area.

100.    Upon information and belief, Ms. LaFortune was replaced by a non-disabled, non-African American individual with lighter skin color than Ms. LaFortune, who had not engaged in protected activities.

101.    On or around February 6, 2023, Ms. LaFortune timely filed a Charge of Discrimination (the "Charge") with the New York City Commission on Human Rights (the "NYCCHR") (Charge Number: M-E-DR-23119159-E) and cross-filed with the Equal Employment Opportunity Commission (the "EEOC") (Charge Number: 16F-2023-00074C).

102.    On or around June 3, 2026, at Ms. LaFortune's request, the NYCCHR issued an administrative convenience dismissal permitting Ms. LaFortune to proceed in court.

103.    On or around June 5, 2026, the EEOC issued Ms. LaFortune a right to sue notice.

104.    This lawsuit is timely filed.

## COUNT I

**(Race and Color Discrimination in Violation of the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York)**

**Ms. LaFortune v. the Company**

105.    Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

106.    The Company is an employer under the definition of Title 8 of The Administrative Code of the City of New York ("NYCHRL") because, at all relevant times, it employed four or more persons.

107.    Ms. LaFortune is a black, African-American woman.

108. The Company, by and through its agents, harassed and discriminated against Ms. LaFortune with respect to her compensation, terms, conditions, and/or privileges of employment, because of Ms. LaFortune's race and/or color.

109. More specifically, the Company subjected Ms. LaFortune to adverse actions because of her race and/or color, including, but not limited to, subjecting Ms. LaFortune to a harassing and otherwise hostile work environment, lower pay than non-black and/or non-African American coworkers, and the termination of her employment.

110. Upon information and belief, the Company replaced Ms. LaFortune with a lesser or similarly qualified, non-African American and/or non-black colleague.

111. The Company has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

112. As a direct and proximate result of the Company's violation of the NYCHRL, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

113. Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

**COUNT II**

**(Race and Color Discrimination in Violation of the New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Ms. LaFortune v. the Company**

114.    Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

115.    The Company is an employer under the New York State Human Rights Law ("NYSHRL") because it employs four or more persons.

116.    Ms. LaFortune is a black, African-American woman.

117.    The Company, by and through its agents, harassed and discriminated against Ms. LaFortune with respect to her compensation, terms, conditions, and/or privileges of employment, because of Ms. LaFortune's race and/or color.

118.    More specifically, the Company subjected Ms. LaFortune to adverse actions because of her race and/or color, including, but not limited to, subjecting Ms. LaFortune to a harassing and otherwise hostile work environment, lower pay than non-black and/or non-African American coworkers, and the termination of her employment.

119.    Upon information and belief, the Company replaced Ms. LaFortune with a lesser or similarly qualified, non-African American and/or non-black colleague.

120.    The Company has engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

121.    As a direct and proximate result of the Company's violation of the NYSHRL, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to, lost

compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

122.    Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

## COUNT III

### (Race and Color Discrimination in Violation of Title VII)

### Ms. LaFortune v. the Company

123.    Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

124.    During all relevant periods, the Company was an employer under Title VII, 42 U.S.C. §§ 2000e et seq. (hereinafter, "Title VII"), because it was a person engaged in an industry affecting commerce and had fifteen or more employees for each working day in each of twenty or more calendar weeks during the relevant calendar years.

125.    Ms. LaFortune is a black, African-American woman.

126.    The Company, by and through its agents, harassed and discriminated against Ms. LaFortune with respect to her compensation, terms, conditions, and/or privileges of employment, because of Ms. LaFortune's race and/or color.

127.    More specifically, the Company subjected Ms. LaFortune to adverse actions because of her race and/or color, including, but not limited to, subjecting Ms. LaFortune to a harassing and otherwise hostile work environment, lower pay than nonblack and/or non-African American coworkers, and the termination of her employment.

128.    Upon information and belief, the Company replaced Ms. LaFortune with a lesser or similarly qualified, non-African American and/or non-black colleague.

129.    The Company, including through its agents and employees, committed a discriminatory act in a willful, wanton, and/or malicious manner.

130.    As a direct and proximate result of the Company's violation of Title VII, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

131.    Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, emotional distress damages, other compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, injury to reputation, diminished earning capacity, interest, attorney's fees, and costs.

**COUNT IV**

**(Disability Discrimination and Failure to Accommodate in Violation of the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York)**

**Ms. LaFortune v. the Company**

132.    Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

133.    The Company is an employer under the definition of Title 8 of The Administrative Code of the City of New York ("NYCHRL") because, at all relevant times, it employed four or more persons.

134.    Ms. LaFortune suffered (and at all relevant times suffered) from a disability, including, but not limited to, generalized anxiety disorder.

135.    Ms. LaFortune's generalized anxiety disorder was an impairment that substantially limited one or more of Ms. LaFortune's major life activities, including, but not limited to, focusing, concentrating, and socializing.  Ms. LaFortune's generalized anxiety disorder was an impairment that also substantially limited one or more of Ms. LaFortune's major bodily functions, including, but not limited to, her brain and neurological functions.

136.    At all relevant times, Ms. LaFortune was a qualified employee and was capable of performing the essential functions of her job with and/or without one or more reasonable accommodations.

137.    Ms. LaFortune disclosed her disability to the Company and/or the Company was aware of Ms. LaFortune's disability. Furthermore, the Company regarded Ms. LaFortune as disabled.

138.    Ms. LaFortune requested, utilized, and/or sought to utilize disability-related reasonable accommodations that would have assisted her in performing the essential functions of her job. These requested reasonable accommodations included intermittent and continuous medical leave.

139.    The disability-related accommodations requested and/or utilized by Ms. LaFortune did not pose an undue burden on the Company.

140.    The Company discriminated against Ms. LaFortune due to her disabilities by subjecting Ms. LaFortune to adverse actions, including, but not limited to, a harassing and otherwise hostile work environment, lower pay than nondisabled coworkers, and the termination of her employment.

141.    Upon information and belief, the Company replaced Ms. LaFortune with a lesser or similarly qualified, non-disabled employee.

The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. LaFortune and/or conduct so reckless as to amount to such disregard.

142.    As a direct and proximate result of the Company's violations of the NYCHRL, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

143.    Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, uncapped compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), emotional distress damages, job restoration with full seniority and benefits, punitive damages, injury to reputation, interest, attorneys' fees, and costs.

## COUNT V

**(Disability Discrimination and Failure to Accommodate in Violation of the New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Ms. LaFortune v. the Company**

144.    Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

145.    At all relevant times, the Company was an employer in the State of New York, including because they employed four or more employees in the State of New York.

146.    The Company is an employer under the definition of Executive Law Article 15 ("NYSHRL").

147.    Ms. LaFortune suffered (and at all relevant times suffered) from a disability, including, but not limited to, generalized anxiety disorder.

148.    Ms. LaFortune's generalized anxiety disorder was an impairment that substantially limited one or more of Ms. LaFortune's major life activities, including, but not limited to, focusing, concentrating, and socializing.  Ms. LaFortune's generalized anxiety disorder was an impairment that also substantially limited one or more of Ms. LaFortune's major bodily functions, including, but not limited to, her brain and neurological functions.

149.    At all relevant times, Ms. LaFortune was a qualified employee and was capable of performing the essential functions of her job with and/or without one or more reasonable accommodations.

150.    Ms. LaFortune disclosed her disability to the Company and/or the Company was aware of Ms. LaFortune's disability. Furthermore, the Company regarded Ms. LaFortune as disabled.

151.    Ms. LaFortune requested, utilized, and/or sought to utilize disability-related reasonable accommodations that would have assisted her in performing the essential functions of

her job. These requested reasonable accommodations included intermittent and continuous medical leave.

152.    The disability-related accommodations requested and/or utilized by Ms. LaFortune did not pose an undue burden on the Company.

153.    The Company discriminated against Ms. LaFortune due to her disabilities by subjecting Ms. LaFortune to adverse actions, including, but not limited to, a harassing and otherwise hostile work environment, lower pay than nondisabled coworkers, and the termination of her employment.

154.    Upon information and belief, the Company replaced Ms. LaFortune with a lesser or similarly qualified, non-disabled employee.

The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. LaFortune and/or conduct so reckless as to amount to such disregard.

155.    As a direct and proximate result of the Company's violations of the NYSHRL, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

156.    Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, uncapped compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), emotional distress damages, job restoration with full seniority and benefits, punitive damages, injury to reputation, interest, attorneys' fees, and costs.

**COUNT VI**

**(Disability Discrimination and Failure to Accommodate in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**

**Ms. LaFortune v. the Company**

157.    Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

158.    During all relevant times, the Company was an employer under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (hereinafter the "ADA"), because it employed more than 15 persons for 20 or more calendar weeks within the previous 12-month period.

159.    Ms. LaFortune suffered (and at all relevant times suffered) from a disability, including, but not limited to, generalized anxiety disorder.

160.    Ms. LaFortune's generalized anxiety disorder was an impairment that substantially limited one or more of Ms. LaFortune's major life activities, including, but not limited to, focusing, concentrating, and socializing.  Ms. LaFortune's generalized anxiety disorder was an impairment that also substantially limited one or more of Ms. LaFortune's major bodily functions, including, but not limited to, her brain and neurological functions.

161.    At all relevant times, Ms. LaFortune was a qualified employee and was capable of performing the essential functions of her job with and/or without one or more reasonable accommodations.

162.    Ms. LaFortune disclosed her disability to the Company and/or the Company was aware of Ms. LaFortune's disability. Furthermore, the Company regarded Ms. LaFortune as disabled.

163.    Ms. LaFortune requested, utilized, and/or sought to utilize disability-related reasonable accommodations that would have assisted her in performing the essential functions of

her job. These requested reasonable accommodations included intermittent and continuous medical leave.

164.    The disability-related accommodations requested and/or utilized by Ms. LaFortune did not pose an undue burden on the Company.

165.    The Company discriminated against Ms. LaFortune due to her disabilities by subjecting Ms. LaFortune to adverse actions, including, but not limited to, a harassing and otherwise hostile work environment, lower pay than nondisabled coworkers, and the termination of her employment.

166.    Upon information and belief, the Company replaced Ms. LaFortune with a lesser or similarly qualified, non-disabled employee.

The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. LaFortune and/or conduct so reckless as to amount to such disregard.

167.    As a direct and proximate result of the Company's violations of the ADA, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

168.    Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to, lost compensation and benefits (including back pay and front pay), lost benefits, reduced earning capacity, other financial damages, uncapped compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), emotional distress damages, job restoration with full seniority and benefits, punitive damages, injury to reputation, interest, attorneys' fees, and costs.

## COUNT VII

**(Retaliation in Violation of the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York)**

**Ms. LaFortune v. the Company**

169.    Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

170.    Ms. LaFortune engaged in protected activity under New York City law, including, but not limited to, requesting and/or utilizing reasonable accommodations for disabilities which were intended to allow Ms. LaFortune to perform the essential functions of her job and by opposing and/or raising protected concerns related to the discriminatory, harassing, and retaliatory treatment of Ms. LaFortune due to her race, color, and/or disability.

171.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. LaFortune's exercising of, or enjoyment of, one or more rights granted by New York City law.

172.    More specifically, the Company subjected Ms. LaFortune to adverse actions, including, but not limited to, a harassing and otherwise hostile work environment, lower pay than nondisabled, nonblack, non-African American coworkers, and the termination of her employment in whole or in part because Ms. LaFortune engaged in protected activities.

173.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. LaFortune and/or conduct so reckless as to amount to such disregard.

174.    As a direct and proximate result of the Company's violation of New York City law, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to,

lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

175.    Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, job restoration with full seniority and benefits, punitive damages,  interest, attorneys' fees, and costs.

## COUNT VIII

**(Retaliation in Violation of the New York State Human Rights Law, Executive Law Article 15, Section 296)**

**Ms. LaFortune v. the Company**

176.    Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

177.    Ms. LaFortune engaged in protected activity under New York State law, including, but not limited to, requesting and/or utilizing reasonable accommodations for disabilities which were intended to allow Ms. LaFortune to perform the essential functions of her job and by opposing and/or raising protected concerns related to the discriminatory, harassing, and retaliatory treatment of Ms. LaFortune due to her race, color, and/or disability.

178.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. LaFortune's exercising of, or enjoyment of, one or more rights granted by New York State law.

179. More specifically, the Company subjected Ms. LaFortune to adverse actions, including, but not limited to, a harassing and otherwise hostile work environment, lower pay than nondisabled, nonblack, non-African American coworkers, and the termination of her employment in whole or in part because Ms. LaFortune engaged in protected activities.

180. The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. LaFortune and/or conduct so reckless as to amount to such disregard.

181. As a direct and proximate result of the Company's violation of New York state law, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

182. Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, job restoration with full seniority and benefits, punitive damages, interest, attorneys' fees, and costs.

## COUNT IX

### (Retaliation in Violation of Title VII)

183. Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

184.    Ms. LaFortune engaged in protected activity under federal law, including, but not limited to, by opposing and/or raising protected concerns related to the discriminatory, harassing, and retaliatory treatment of Ms. LaFortune due to her race, color, and/or disability.

185.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. LaFortune's exercising of, or enjoyment of, one or more rights granted by federal law.

186.    More specifically, the Company subjected Ms. LaFortune to adverse actions, including, but not limited to, a harassing and otherwise hostile work environment, lower pay than nondisabled, nonblack, non-African American coworkers, and the termination of her employment in whole or in part because Ms. LaFortune engaged in protected activities.

187.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. LaFortune and/or conduct so reckless as to amount to such disregard.

188.    As a direct and proximate result of the Company's violation of federal law, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

189.    Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, job restoration with full seniority and benefits, punitive damages,  interest, attorneys' fees, and costs

**COUNT X**

**(Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. §§12101, et seq.)**

**Ms. LaFortune v. the Company**

190.    Ms. LaFortune incorporates all paragraphs above and below as if set forth fully herein.

191.    Ms. LaFortune engaged in protected activity under the ADA, including, but not limited to, requesting and/or utilizing reasonable accommodations for disabilities which were intended to allow Ms. LaFortune to perform the essential functions of her job and by raising protected concerns related to the Company's failure to provide a reasonable accommodation, refusal to engage in an interactive dialogue, and/or disparate treatment of Ms. LaFortune due to her disability.

192.    The Company unlawfully coerced, intimidated, threatened, and/or interfered with Ms. LaFortune's exercising of, or enjoyment of, one or more rights granted by the ADA.

193.    More specifically, the Company subjected Ms. LaFortune to adverse actions, including, but not limited to, a harassing and otherwise hostile work environment, lower pay than nondisabled, nonblack, non-African American coworkers, and the termination of her employment in whole or in part because Ms. LaFortune engaged in protected activities.

194.    The Company's actions were willful, wanton, reckless, and/or involved a conscious disregard of the rights of Ms. LaFortune and/or conduct so reckless as to amount to such disregard.

195.    As a direct and proximate result of the Company's violation of the ADA, Ms. LaFortune has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, loss of earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

196.    Ms. LaFortune seeks all damages to which she is entitled, including, but not limited to lost compensation and benefits (including, but not limited to, back pay and front pay), other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), injury to reputation, diminished earning capacity, job restoration with full seniority and benefits, punitive damages,  interest, attorneys' fees, and costs.

WHEREFORE, Plaintiff, Ketia LaFortune, respectfully requests that this Honorable Court:

Schedule this matter for trial by jury;

A.  Find the Defendant liable on all counts;

B.  Award the Plaintiff her lost compensation and benefits (including, but not limited to, back pay and front pay),

C.  Award the Plaintiff other monetary damages, including damages for her diminished earning capacity and injury to reputation;

D.  Award the Plaintiff emotional distress damages;

E.  Award the Plaintiff compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses);

F.  Award the Plaintiff punitive damages;

G.  Restore and reinstate the Plaintiff to her employment with full seniority and benefits;

H.  Award the Plaintiff her reasonable attorneys' fees;

I.  Award the Plaintiff interest and costs;

J.  Award the Plaintiff all other damages to which she is entitled; and

K.  Grant such further relief as is just and equitable.

Respectfully Submitted,

KETIA LAFORTUNE

By her attorneys,

THE LAW OFFICES OF WYATT &
ASSOCIATES P.L.L.C

Date:   July 15, 2026               By:          /s/ Michael R. Varraso

Michael R. Varraso
mvarraso@wyattlegalservices.com
NY State Bar: 5619291

Benjamin J. Wyatt
BWyatt@Wyattlegalservices.com
NY State Bar: 5604590

The Law Offices of Wyatt & Associates,
P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1112
Facsimile: (603) 685-2868

New York Office:
69 State Street, 13th Floor
Albany, NY 12207